UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES *ex rel*. BARBARA PETKOVIC et al., | CASE NO. 5:10-cv-2846 |
| RELATORS, | JUDGE SARA LIOI |
| v. | **MEMORANDUM OPINION** |
| FOUNDATIONS HEALTH SOLUTIONS, INC. FKA BCFL HOLDINGS DBA PROVIDER SERVICES, | |
| RESPONDENT. | |

Before the Court is respondent Foundations Health Solutions, Inc. f/k/a/ BCFL Holdings d/b/a Provider Services's ("FHS") motion to dismiss (Doc. No. 59 ["Mot."]) relators' amended complaint (Doc. No. 49 ["Am. Compl."]) in its entirety and dismiss all of the relators' claims against FHS. For the reasons discussed herein, respondent's motion to dismiss is GRANTED.

I.     BACKGROUND

Relators Barbara Petkovic ("Petkovic") and Christine Shiroke ("Shiroke," collectively "relators") originally brought this *qui tam* action under the False Claims Act ("FCA") alleging violations of the FCA by their former employer Mobile Medical, Inc. ("Mobile") and by FHS and Rikco International, LLC ("Rikco"). Mobile is an Ohio corporation that has provided ancillary dental, optometry, podiatry, and audiology services to Ohio nursing homes. (Am. Compl. ¶ 16.) Mobile uses the trade names "Mobile Medical," "OnSight Eye Care," "OnSight Healthcare," and "OnHealthCare." (*Id.*) FHS is an Ohio corporation that provides services to Ohio nursing homes, including operational management, billing of Medicaid and Medicare, purchase and cost

management, payroll processing, clinical support services, and Centers for Medicare and Medicaid Services (CMS) regulatory reporting. (*Id.* ¶¶ 14–15.) Petkovic was employed by Mobile as a podiatrist from August 2009 until September 2010. (*Id.* ¶ 17.) She served at FHS facilities and knew of alleged kickbacks received by FHS and the false claims submitted to the government for payment or approval. (*Id.*) Shiroke worked for Mobile as a podiatry technician from September 2009 until September 2010. (*Id.* ¶ 18.) Likewise, Shiroke gained personal knowledge of the alleged kickbacks received by FHS and of the false claims submitted to the government for payment or approval. (*Id.*)

Relators filed their original complaint under seal in 2010. (Doc. No. 1.) In 2015, Mobile settled its alleged violations with the United States and was dismissed as a party. (Doc. No. 42 (Sealed Stipulation and Order).) Subsequently, the United States notified the Court of its decision not to intervene in the case against the remaining defendants. (Doc. No 46.) The case was unsealed on August 28, 2017. (Doc. No. 47.) Relators then filed their amended complaint against FHS solely.[1] FHS's motion to dismiss followed. Relators filed their opposition (Doc. No. 64 ["Opp'n"]) and FHS replied (Doc. No. 66 ["Reply"]).

## II. STANDARD OF REVIEW

In a *qui tam* action, a private party brings a suit for fraud committed against the government as a *qui tam* relator. *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 506–07 (6th Cir. 2009). Before bringing a *qui tam* suit, a relator must serve the complaint upon the government, and the complaint must remain under seal for at least sixty days. 31 U.S.C. § 3730(b)(2). During this time period, the government may intervene and "take over" the action. *Medtronic*, 552 F.3d at 507 (citing 31 U.S.C. § 3729(a)(7)). If the government declines intervention, the relator may

---

[1] Relators did not name Ricko as a defendant in their amended complaint.

2

serve the complaint on the defendant and proceed with the action on their own. *Id.* (citing 31 U.S.C. § 3730(c)(3)). As an incentive to bring *qui tam* actions, the FCA awards relators in successful suits a portion of the proceeds recovered. *Id.* (citing 31 U.S.C. § 3730(d)).

### A. <u>Motion to Dismiss Standard</u>

When addressing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must construe the complaint in the light most favorable to the relator and accept all well-pleaded material allegations in the complaint as true. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017) (setting forth the standard of review for a Rule 12(b)(6) motion to dismiss); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The sufficiency of the complaint is tested against the notice pleading requirements of Fed. R. Civ. P. 8(a)(2), which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true," to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). In such a case, the plaintiff

has not "nudged [his] claims across the line from conceivable to plausible, [and the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 683 (citation omitted).

A complaint need not set down in detail all the particulars of a plaintiff's claim. However, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79 (This standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (internal quotations marks omitted), *abrogated on other grounds by Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001).

### B. Rule 9(b) Heightened Standard

Relators bringing an action under the FCA must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b). *United States v. Walgreen Co.*, 846 F.3d 879, 880 (6th Cir. 2017). To comply with Rule 9(b), a complaint must, at a minimum, specify the "time, place, and content" of the alleged false representation. *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007). In assessing a FCA claim under Rule 9(b), a complaint that merely pleads a *false scheme* with particularity is inadequate. *Bledsoe*, 501 F.3d at 504. Under Sixth Circuit case law, "Rule 9(b) does not permit a [FCA] plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted." *United States ex rel. Eberhard v. Physicians*

*Choice Lab. Servs., LLC*, 642 F. App'x 547, 551 (6th Cir. 2016) (quoting *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

Rather, "[a] relator cannot meet [Rule 9(b)'s] standard without alleging which specific false claims constitute a violation of the FCA." *Id.* (quoting *Bledsoe*, 501 F.3d at 505). "The identification of at least one false claim with specificity is 'an indispensable element of a complaint that alleges a [FCA] violation in compliance with Rule 9(b).'" *Walgreen*, 846 F.3d at 880 (quoting *Bledsoe*, 501 F.3d at 504). "In assessing FCA claims under Rule 9(b), [the Sixth] Circuit imposes a 'strict requirement that relators identify actual false claims.'" *Eberhard, LLC*, 642 F. App'x at 550 (quoting *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 472 (6th Cir. 2011)).

Relators need not identify *every* allegedly false claim submitted to the government for payment. *Chesbrough*, 655 F.3d at 470. Still, to satisfy Rule 9(b), relators must allege representative examples of submitted claims. *Id.* The representative claims must be "illustrative of the class of all claims covered by the fraudulent scheme." *Id.* (quoting *Bledsoe*, 501 F.3d at 511) (internal quotation mark omitted). "[T]he examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims." *Bledsoe*, 501 F.3d at 510.

C. **Sixth Circuit's "Relaxed Standard"**

In FCA cases, the Sixth Circuit requires the heightened Rule 9(b) pleading standard in the majority of cases. However, it recognizes a narrow exception when a relator pleads specific facts based on their personal billing-related knowledge that support a strong inference that specific false claims were submitted to the government for payment. *See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 838 F.3d 750, 769 (6th Cir. 2016). This "relaxed"

standard is an extremely narrow exception that has been applied only one time by the Sixth Circuit. *See id.*

In *Prather*, the relator ("Prather") was hired by a company to review its Medicare billing documentation and to ensure compliance with state and federal insurance guidelines. *Id.* at 755. Prather worked with the at-issue company's billing department and the claims were sent to the government for payment after her review. *Id.* at 757–58. During her review, Prather became aware of falsified Medicare claims. *Id.* at 758. She brought the falsities to the attention of her supervisors, who told her to ignore them. *Id.* Subsequently, Prather filed a FCA action. *Id.* at 758–59. Although Prather could not point to a single, specific claim submitted to the government, the Sixth Circuit found she had enough personal, billing-related knowledge of the company's billing practice to create a "strong inference" that the claims she reviewed were submitted to the government for payment. *Id.* at 769.

The Sixth Circuit has rejected an application of this relaxed standard in all other cases. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 916 (6th Cir. 2017) ("[R]elators do not allege [the] type of personal knowledge [in *Prather*]. Relators were sales representatives of [defendant] and, unlike the relator in *Prather*, did not directly engage with claims whatsoever. In order for the *Prather* exception to apply, it is not enough to allege personal knowledge of an allegedly fraudulent scheme; a relator must allege adequate personal knowledge of billing practices themselves."); *Walgreen Co.*, 846 F.3d at 882 ("Unlike Prather, [relator] failed to provide the factual predicates necessary to convince us that actual false claims in all likelihood exist. He does not allege personal knowledge of Walgreen's claim submission procedures. And he does not otherwise allege facts from which it is likely that a claim was submitted to the government." (quotation marks and citations omitted)); *Eberhard*, 642 F. App'x at 553 ("Eberhard

6

can allege knowledge of only the 'fraudulent scheme.' . . . Eberhard's complaint does not allege any personal knowledge or any specifics of [respondent's] submission of claims to the government. Eberhard's alleged personal knowledge does not entitle him to a relaxation of Rule 9(b)."); *Chesbrough*, 655 F.3d at 471–42 ("[C]ase law . . . suggests that the requirement that a relator identify an actual false claim may be relaxed when, even though the relator is unable to produce an actual billing or invoice, he or she has pled facts which support a strong inference that a claim was submitted. Such an inference may arise when the relator has 'personal knowledge that the claims were submitted by [d]efendants ... for payment.' Here, the [relators] lack . . . personal knowledge of billing practices or contracts with the government. . . . Their personal knowledge is limited to the allegedly fraudulent scheme." (citations omitted)).

Personal knowledge of the allegedly fraudulent *scheme* is not enough to warrant application of the relaxed standard. *Eberhard*, 642 F. App'x at 552–53 ("[W]e refuse[ ] to relax the representative-claim requirement where the [relators'] 'personal knowledge' related only to the 'allegedly fraudulent scheme' and not the submission of specific fraudulent claims." (quoting *Chesbrough*, 655 F.3d 472)). Relators must have personal knowledge of the "submission of specific fraudulent claims." *Id.* "The FCA 'attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the *claim for payment*.'" *Id*. at 552 (quoting *Sanderson*, 447 F.3d at 877–78).

### III. DISCUSSION

Relators claim in their amended complaint that FHS caused the submission of false claims to Medicare and Medicaid in violation of the Anti-Kickback Statute ("AKS"). 42 U.S.C. § 1320a-7b(b). (Am. Compl. ¶ 1.) Relators allege that FHS accepted kickbacks from Mobile for referrals at FHS's managed and/or owned nursing home facilities. (*Id.*) Relators contend that kickbacks

included (1) profits from diabetic shoes dispensed to patients, (2) patient transport services, (3) "warranty" replacements and repairs for patients' glasses, dentures, and hearing aids, and (4) "free" patient medical services for which Mobile did not require reimbursement. (*Id.* ¶ 38.)

The relators' claims arise under the FCA. Relevant here, the FCA imposes civil liability on any person who: (A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment of approval[.]" 31 U.S.C. § 3729(a)(1)(A).[2]

Specifically, relators allege that FHS violated the FCA by violating the AKS. Compliance with the AKS is a condition of payment for any claim submitted to a federal health care program, including Medicare and Medicaid. *United States ex rel. Kester v. Novartis Pham. Corp.*, 41 F. Supp. 3d 323, 330–31 (S.D.N.Y. 2014). Therefore, liability under the FCA can be predicated on a violation of the AKS. The AKS imposes fines and criminal liability on:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind . . . in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(1). The AKS attaches liability to the person who pays the remuneration *and* the person who receives the remuneration. 42 U.S.C. § 1320a-7b(b).

A violation of the AKS requires: "1) remuneration to a person or entity in a position to refer [f]ederal health care program patients, 2) that could reasonably induce the person or entity to

---

[2] As this Court can best construe, the facts alleged by relators amount to a claim under subsection (a)(1)(A) only. In their amended complaint, relators cite the language of § 3729(a)(1)(B), but claims under this subsection require a false statement or record connected to a claim submitted to the government. Relators' amended complaint is completely devoid of any allegations that FHS made any false statements connected to any claims submitted to the government. Moreover, in their amended complaint, each alleged count cites language from subsection (a)(1)(A) only. No other subsections of the FCA are relevant to the facts alleged in relators' amended complaint. As such, the Court will analyze relators' claims as alleged violations of § 3729(a)(1)(A).

8

refer such patients. *Miller v. Abbott Labs.*, 648 F. App'x 555, 561 (6th Cir. 2016) (quoting *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015)). "Items or services of nominal value are permitted under the AKS because those items or services could not reasonably be expected to induce a referral." *Id.* Instead, remuneration includes, "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a(i)(6).

**A. Diabetic Shoes**

Relators claim that FHS violated the FCA by receiving profits for each pair of diabetic shoes that Mobile ordered for an FHS Medicare or Medicaid patient (Am. Compl. ¶ 40.) Instead of billing the government directly for the shoes, Mobile would bill Optibill—a company solely owned and controlled by FHS—and then Optibill would bill the government for the shoes. (*Id.* ¶ 40–41.) Relators allege that Optibill would request a higher payment from the government than Mobile charged, and FHS—through its relationship with Optibill— would keep the difference as a kickback profit. (*Id.*)

In their motion to dismiss, FHS contends that relators have failed to state a claim sufficient under Rule 9(b) because they do not name a single claim for diabetic shoes submitted to the government for payment. In response, relators ask this court to consider the information they have provided about the billing practices of Mobile and Optibill and to apply the Sixth Circuit's "relaxed" Rule 9(b) standard.

1. Sixth Circuit's Relaxed Standard

As discussed, the relaxed standard exception is extremely narrow. It has been applied by the Sixth Circuit only once, in a case in which the relator had extensive personal knowledge of the billing practices of the company at issue. *See Prather*, 838 F.3d 750. Given the facts alleged in

relators' amended complaint, the Court finds that application of the relaxed standard is not appropriate in this case.

Here, the relators lack personal knowledge of FHS's billing practices. Relators' personal knowledge is limited to the allegedly fraudulent scheme. Relators were employees of Mobile. (Am. Compl. ¶¶ 17–18.) They were not employees of FHS. They worked in FHS facilities, but they do not allege that they had any knowledge or exposure to FHS's billing practices. Relators provide an email detailing FHS's proposed billing practices, but this email is between *Mobile* employees—not FHS employees. (*Id.* ¶ 42; Doc. No. 49-2 at 292.[3]) An email between Mobile employees does not create a strong inference that the email contained the true billing practices of FHS. An email between Mobile employees does not equate to personal, billing-related knowledge of FHS's practices.

Relators also provide a spreadsheet of claims for diabetic shoes. (Am. Compl. ¶ 45.) Relators claim that the spreadsheet contains "twenty representative examples of false claims from Optibill to the Government[.]" (Opp'n at 377.) This is misleading. As explained in relators' amended complaint, and their opposition to respondent's motion to dismiss, the spreadsheet lists claims for diabetic shoes and contains the date on which the claims where billed from Mobile to *Optibill*—not to the government. The spreadsheet does not contain any date on which Optibill, FHS, or anyone else, submitted a claim to the government. Nowhere in the amended complaint do relators provide any claim submitted to the government for payment.

Relators have not alleged any personal knowledge of FHS's billing-related procedures. As such, the Court finds the relaxed standard is inappropriate here. It is true that the Sixth Circuit has

---

[3] All page number references are to the page identification number generated by the Court's electronic docketing system.

stated there might be other instances where this exception might apply,[4] but the Court does not find the relaxed standard appropriate in this case because relators have failed to allege a strong inference that allegedly false claims were ever submitted to the government for payment.

   2. Rule 9(b) Heightened Standard

Without the relaxed standard, relators must satisfy Rule 9(b) by providing at least one representative claim that was actually submitted to the government for payment. As noted above, relators do not identify a single allegedly false claim submitted to the government for payment. As such, relators claim that FHS violated the FCA by receiving illegal kickbacks from diabetic shoe orders must be dismissed for failure to state a claim upon which relief can be granted.

   **B. Transportation**

Next, relators claim that FHS violated the FCA by receiving a "free transporter" at any FHS nursing home that referred all four services (podiatry, audiology, optometry, and dentistry) to Mobile. (Am. Compl. ¶ 47.) Relators allege that the transporters were Mobile employees who moved residents from the residents' rooms to treatment rooms. (*Id.*) Relators allege further that these transporter services saved FHS facilities significant expense and that FHS demanded free transporters to contract with Mobile. (*Id.*)

Relators have failed to plead sufficiently that any FHS facility received *free* transporter services, that Mobile transporters were actually used at any FHS facility, that FHS received a benefit from any transporter services, or that FHS demanded transporter services to contract with Mobile.

---

[4] The Sixth Circuit has noted that "[t]here may be other situations in which a relator alleges facts from which it is highly likely that a claim was submitted to the government for payment," *Eberhard*, 642 F. App'x at 553 (quoting *Chesbrough*, 655 F.3d at 472), but it has never found another case that warranted the relaxed standard or discussed other situations that might warrant the relaxed standard.

11

Relators provide a list of FHS facilities that "require a transporter." (Am. Compl. ¶ 49.) However, they provide no facts to support their allegation that these transporter services were provided for free. The best relators provide is a sales pitch email from a Mobile executive that explains Mobile's practice of providing transporters, but the email does not say the transporters are free. (Doc. No 49-5.) Nor do relators provide any facts that Mobile's transporters were used at all. Relators identify three different residents with claims submitted to Medicaid, but none of the identified claims specify whether a transporter was used for the provided services. (Am. Compl. ¶ 50.)

Further, relators have provided no facts to support their conclusory allegation that FHS demanded the transporters services to contract with Mobile. Moreover, the free transporter services are not included in the contracts between FHS and Mobile. (Doc. Nos. 49-6, 49-7, 49-8.) The only place the transporters services are mentioned are emails sent by Mobile employees. Relators have provided no facts to support their allegations that FHS demanded, accepted, or used free transporter services.

Finally, relators allege that FHS received a benefit from Mobile's transporters by saving costs, or, alternatively, by having a competition advantage. Under the law, FHS is not required to provide residents with transportation to services; FHS is only required to assist residents in arranging for transportation to services. 42 C.F.R. §§ 483.55(a)(4)(ii), (b)(2)(ii) (dental services); 42 C.F.R. § 483.25(a)(2) (vision and hearing); 42 C.F.R. § 483.25(b)(2)(ii) (podiatry). As FHS points out in their motion to dismiss, "The Guidance of Surveyors for Long Term Care Facilities clarifies that 'this standard is not requiring a facility to defray or cover the costs of transportation.'" (Mot. at 355 (citing State Operations Manual, Appendix PP, F778).)

Relators allege that, despite FHS having no legal responsibility to defray or cover the costs of residents' transportation, FHS still received a cost-savings benefit from Mobile's transporters. Relators cite an email from a Mobile executive to an FHS executive claiming the amount of FHS's savings. (Doc. No. 49-5.) However, relators do not point to any savings that FHS actually experienced. They claim, "it is absurd to believe FHS nursing home employees were not transporting the patients themselves prior to the deal with Mobile Medical . . . ." (Opp'n at 382.) At the motion to dismiss stage, the Court does not determine what likely happened factually. The Court is tasked with deciding whether the relators have pleaded sufficient facts. Here, besides their statement that FHS probably used their own staff, relators do not point to a single instance where an FHS staff member transported residents in FHS facilities without Mobile transporters, and, thus, have failed to plead that FHS saved any costs by using Mobile's transporters.

Alternatively, relators claim that the transporter services were a benefit to FHS because FHS could advertise to potential residents that FHS facilities had free transporters. (Opp'n at 382.) Relators allege this gave FHS facilities a competitive advantage in the marketplace because residents would likely choose FHS facilities over facilities without this cheaper transporter option. (*Id.*) However, relators do not provide any support for this allegation. They do not identify any facts, whether by way of factual allegations or attached documentation that, if believed, would support their claim that FHS facilities were advertising any free transporter services. As such, relators have failed to plead sufficiently any facts to support their allegation that FHS benefitted from a competitive advantage.

Relators have failed to meet the Rule 9(b) heightened pleading standard. Moreover, the relaxed Rule 9(b) standard is inappropriate because relators do not allege any personal, billing-related knowledge of FHS. For all of the reasons listed above, relators' claim that FHS was

13

receiving illegal kickbacks in the form of free transporter services must be dismissed for failure to state a claim upon which relief can be granted.

### C. Warranties

Relators also allege that FHS violated the FCA by receiving warranties from Mobile for free replacements of residents' eye glasses, dentures, and hearing aids. (Am. Compl. ¶ 52.) Relators allege that the replacements saved FHS facilities the expense of replacing these items themselves. (*Id.*) Relators allege FHS was otherwise required to provide these replacements. (*Id.*)

Identification of at least one false claim submitted to the government is an indispensable element to pleading a FCA claim successfully. *See Walgreen*, 846 F.3d at 881. In *Walgreen*, the *qui tam* relator alleged that Walgreen distributed illegal kickbacks to Medicare and Medicaid recipients by offering $25 gift cards to customers that transferred their prescriptions. *Id.* at 880. The Sixth Circuit held that the relator failed to meet the heighted Rule 9(b) pleading standard because he did not identify a single false claim submitted to the government. *Id.* All the relator alleged was an allegedly fraudulent scheme by identifying the existence of the offer of gift cards. *Id.* ("[Relator] does not identify any false claim arising from any of those (allegedly) induced customers. He does not tell us the names of any such customers . . . . He does not tell us the dates on which they filled prescriptions at Walgreens. He does not tell us the dates on which Walgreens filed the reimbursement claims with the government. He does not, indeed, even say that these unnamed customers filled any prescriptions at Walgreens at all, let alone that Walgreens processed them and filed reimbursement claims with the government. We are left to infer these essential elements . . . . But inferences and implications are not what Civil Rule 9(b) requires. It demands specifics—at least if the claimant wishes to raise allegations of fraud against someone.")

Like the relator in *Walgreen*, relators have failed to satisfy the high Rule 9(b) pleading threshold. Under Rule 9(b), the relators must allege specific claims submitted to the government that support their false claim allegations. Here, relators have provided support merely for an allegedly fraudulent *scheme*. They have not identified a single claim submitted to the government for replaced dentures, eye glasses, or hearing aids.

Relators attempt to satisfy the pleading standard by identifying two different claims submitted to Medicaid for residents at FHS facilities—facilities that relators allege received warranties from Mobile. (Am. Compl. ¶ 57.) However, while these claims contain general dental, audiology, and visual services, they do not contain any charges for, or mention of, replacement dentures, eye glasses, or hearing aids. It is not enough that relators point to these submitted Medicaid claims and conclude that were tainted by an illegal warranties kickback. To sustain an inference that they were tainted by an illegal warrantied kickback, relators must plead the existence of the illegal warranty kickbacks.

To that end, relators provide one email from an FHS administrator, in which the administrator expresses that, in his view, FHS facilities contracted with Mobile because, "[Mobile has] a replacement guarantee on the dental and vision side that is unmatched by any competitor that ensures we don't have expensive replacement issues when there are lost dentures and/or lost glasses." (Doc. No. 49-6.) Still, the email does not identify a single instance when Mobile provided a replacement under the warranty to FHS. Likewise, relators provide representative contracts between Mobile and FHS facilities that acknowledge that Mobile *may* provide the replacements, but relators do not allege one single instance when Mobile *did* provide replacements. (Doc. Nos. 49-7, 49-8, 49-9.) Like the identified gift card offers in *Walgreen*, the existence of an allegedly

15

fraudulent scheme is not sufficient to pass the Rule 9(b) threshold—relators must plead the existence of a false claim submitted to the government.

Moreover, relators do not provide any support for their allegation that FHS actually experienced any cost savings. Relators do not identify any instances where FHS replaced eye glasses, dentures, or hearing aids at FHS's cost. Moreover, they do not identify a single instance of Mobile supplying a replacement pair of eye glasses, hearing aid, or pair of dentures. Relators provide only an email from a Mobile projecting how much Mobile believed FHS would save. (Doc. No. 49-5.)

Rule 9(b) is a high pleading threshold, but absent a single representative claim submitted to the government, or an instance where replacements were provided, relators have failed to meet the standard. Moreover, the relaxed Rule 9(b) standard is inappropriate because relators do not allege any personal, billing-related knowledge of FHS. As such, relators claim that FHS violated the FCA by receiving an illegal kickback in the form of warranties for replacement dentures, glasses and hearing aids must be dismissed for failure to state a claim upon which relief can be granted.

**D. Free Services**

Lastly, in their amended complaint, relators allege that Mobile did not charge FHS nursing homes for podiatry, audiology, optometry, and dentistry services provided during patients' Medicare Part A coverage period.[5] (Am. Compl. ¶ 59.) Relators allege that FHS billed the government for these services and kept the payments as an illegal kickback. (*Id.*)

---

[5] Medicare consists of two parts. Part A of the Medicare Program provides insurance for hospital and related post-hospital services. 42 U.S.C. §§ 1395c–1395i-5. Part B of the Medicare Program provides insurance for supplementary medical services, primarily physicians' services. 42 U.S.C. §§ 1395j–1395w-6. Medicare Part A coverage includes post-hospital extended care services for up to 100 days during any spell of illness. 42 U.S.C. § 1395d(A)(2).

Again, relators fail to plead these allegations with sufficient particularity to pass muster under Rule 9(b). Relators do not allege a single claim submitted by FHS to the government for these free services. Relators provide a list with "2013 Total Medicare Payment Amount[s]" for various FHS facilities, but relators provide no facts to support an inference that the listed totals include a payment for any free services provided by Mobile. Relators also point to their transportation- and warranty-related claims to support an inference that FHS submitted false claims for free services under Medicare. However, the identified transportation- and warranty-related claims involved *Medicaid* patients only, (Am. Compl. ¶¶ 50, 57), while the "free services" kickback pertained to *Medicare* participants only. Allegedly false claims submitted to Medicaid are not representative examples for the broader allegation that FHS kept illegal reimbursements from free Medicare services. *Chesbrough*, 655 F.3d at 470; *Bledsoe*, 501 F.3d at 510–11.

Without identification of a single representative claim, relators' allegations fail under Rule 9(b). Moreover, the relaxed Rule 9(b) standard is inappropriate because relators do not allege any personal, billing-related knowledge of FHS.

Alternatively, relators allege that the free services were an illegal kickback that induced FHS to enter into contracts with Mobile. To that extent, relators allege that, regardless of whether or not FHS submitted claims for the free services, *every* claim that was submitted to the government for an FHS patient treated by Mobile is "tainted" by this illegal kickback and, consequently, is a violation of the FCA. However, to allege that the free services kickback induced referrals and tainted all of the claims submitted, relators must first sufficiently allege that the free services were a kickback that existed. In this, the relators have failed.

As discussed, relators did not identify a single representative claim submitted to the government by FHS for any free services, and relators allege no other facts to suggest the existence of an illegal free services kickback.

Relators provide language from the contract between FHS and Mobile. The contracts provide that:

> [Mobile Medical] agrees to . . . [b]ill the resident or third party payor (as the case may be) for services rendered. There shall be no fees charged to FACILITY for any residents who reside as a Medicare Part A or 'skilled' stay. Furthermore, FACILITY shall have no obligation to pay for any services provided directly to any resident.

(Reply at 403; *see also* Opp'n at 389; Am. Compl. ¶ 60 (emphasis omitted).)

Relators concede that, as a matter of law, Mobile would never bill FHS for "provider services."[6] (Opp'n at 388.) However, relators contend that Mobile does bill, and should have billed, FHS for "technician services." (Opp'n at 388–89.) Thus, the essence of relators' claim is that Mobile provided technician services to FHS residents, but did not bill FHS for technician services. These technician services are the "free services" at issue. Still, relators allege no facts that technician services were ever provided to FHS's Medicare patients. They provide no examples of Medicare claims submitted to the government, let alone submitted Medicare claims that involved technician services. Relators have failed to allege sufficiently the existence of free services as an illegal kickback. As such, relators' claim that FHS violated the FCA by accepting free services from Mobile must be dismissed for failure to state a claim upon which relief can be granted.

---

[6] In the Balanced Budget Act of 1997, Congress mandated that skilled nursing facilities must be the ones to seek payment from the government for the majority of services provided to Medicare beneficiaries in a skilled nursing facility. Individual service providers could no longer bill Medicare for services separately. However the Act included a number of exceptions. Included among the excluded services are physicians' professional services provided to skilled nursing residents. Service providers bill Medicare directly for physicians'' professional services. SNF Consolidated Billing, Centers for Medicare & Medicaid Services, https://www.cms.gov/Medicare/Billing/SNFConsolidatedBilling/index.html. Thus, under federal law, Mobile would bill the government directly for physician services, Mobile would never bill FHS for physician services.

## IV. CONCLUSION

For the reasons set forth herein, respondent's motion to dismiss (Doc. No. 59) is GRANTED.

**IT IS SO ORDERED**.

Dated: January 17, 2019

**HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE**